Please call the next case. Good morning, Your Honors. My name is Norm Anchors. I appear on behalf of Appellant and Cross Appellee, John Richards Homes Building Company, LLC. I'm going to devote my original argument to the propriety of the issuance of punitive damages by Judge Rhodes and then save my rebuttal for the propriety of the 11 U.S.C. 303i award because, as the courts know, those are the two focuses of the appeal here. Your Honors, Judge Rhodes, the Chief Judge of the Michigan Bankruptcy Court, found as a matter of fact in a court proceeding that Mr. Adell had concocted out of whole cloth a series of misrepresentations made under oath in proceedings before the Michigan court which were designed to do an end run around an 11 U.S.C. 303i award which Judge Rhodes had entered in the first instance, which this court affirmed in every particular on March 1, 2006, and which sanctioned Mr. Adell $2 million in punitive damages under 303i for making a misrepresentation under oath to begin with to initiate an involuntary bankruptcy petition. Judge Rhodes found as a matter of fact that there were three dimensions to these misrepresentations that were made. So I'm clear. You're arguing in favor of the punitive damages that got reversed now, right? Yes. I am arguing in favor of the punitive damages, Your Honors. Thank you. There were three facets to the misrepresentations under oath which Mr. Adell made. Number one, he misrepresented under oath in the Michigan proceedings that he had borrowed money from his employers. That was to do an end run around JRH's wage garnishment, which would have had enormous consequences over time if JRH had continued to garnish because Mr. Adell paid himself $27 million in compensation between 2003 and 2009. There was attorney's fees that was awarded with respect to all of this, is that correct? Yes, there were attorney fees. Large attorney's fees? Yes, there were large attorney fees awarded, Your Honor. And what I would indicate to the- So the question then is whether it's proper to punish in addition to award compensation? Yes, Your Honor. I think that's exactly correct. What's the source of that power? I mean, it's kind of an extraordinary power. There are two sources to the power, Your Honor. The first source is the Chambers v. NASSCO case, 501- It's an attorney's fees case, though, right? It is an attorney fees case. However, the court did specifically say in that case that the attorney fee which was being awarded was a punitive sanction. I understand, but it's a punitive sanction that also compensated for loss. That is correct. Do you have any support for the idea that it can be punitive without compensating for loss, which would be remarkable? Yes, Your Honor. This court's decision in Mann v. University of Cincinnati. That was a case where the court specifically approved an award of punitive damages under Chambers v. NASSCO in addition to an award of attorney fees. What happened in that case was that a party and its counsel reviewed documents which had been subpoenaed before the opposing party had a chance to object to the subpoena. The district court awarded a standalone punitive damages award sanction. How much? $2,500. And separate and apart from that, it awarded another $3,300 for fees incurred in objecting to the subpoena and redressing the problem that was caused by the early look at the award. Obviously, Your Honor, this case is a considerable multiple of $2,500. However— And that's really the only support that you have, then, right? No, it is not the only support that I have, Your Honor. There are numerous cases which have sustained the award of punitive damages under Chambers v. NASSCO and under 11 U.S.C. 105, which is the other peg for doing so. Do they all fall in what some of these cases have termed minor punitive sanctions? Or do you have something that would just say, you may give punitive sanctions that fit the appropriate damage or harm or teach the lesson that needs to be taught in this case, as opposed to you have jurisdiction to do these minor punitives but nothing more? Yes, Your Honor. The Campbell case, the Gore case, the TXO case, all Supreme Court cases, indicated two things. Number one, the most significant consideration which Your Honors ought to take into account in determining whether punitive damages are awarded is the reprehensibility of the activity that was engaged in. And in that regard, if you're a recidivist, that is highly relevant to what the court ought to do. And does that—do you argue that that power flows from the inherent power of the court to protect the integrity of the orders that it issues and to protect the integrity of the process? Does it flow from that? Yes, Your Honor. And that is exactly what this court held in the In re Downs Mopother v. Mopother case. The court specifically— Those cases that you cited a minute ago, are those Federal lower court cases? Those were Supreme Court cases, Your Honor, which talk about— No, but who ordered the damages, the punitive damages in those cases? Those cases were district court cases. But there are bankruptcy court cases that have also awarded significant punitive damages under the authority of Chambers v. NASCO, which this court recognized in In re Downs Mopother v. Mopother. I'll give Your Honor a couple of examples. In re Dynamic Tours and Transportation, Inc., 359-BR-336, which awarded $50,000 in punitive damages under the authority of Chambers and 11 U.S.C. 105, in addition to $35,000 in attorney fees— Who decided that? In re WVF Acquisition, 420-BR-902— Who's deciding these cases? That was the Middle District of Florida in the first case. In In re WVF Acquisition, 420-BR-92, the bankruptcy court awarded $50,000 in punitive damages against a creditor for violating the automatic stay, plus $51,000 in compensatory damages, including $33,000 in legal fees, and that was under the authority of Chambers and 11 U.S.C. 105. In In re Watkins, the bankruptcy court imposed as a sanction a punitive damages award of treble the debtor's actual damages— Who's deciding the case that you're citing, and who awarded the damages? Understood, Your Honor. I will turn right to the case, then, that this Court decided, the Sixth Circuit case, Archer v. Macomb County Bank, 853 F. 2nd, 497, and this Court held that if compensatory damages were insufficient in the bankruptcy court's reasoned judgment to achieve the bankruptcy court under Chambers has the inherent power to control its own docket. Here's what Archer said, quote, the bankruptcy court is free to impose an appropriate amount of punitive damages. We leave that to the bankruptcy court's discretion. And Judge Rhodes exercised this discretion in this case, Your Honor, because the $2 million punitive damages award, which was upheld by this Court at 439 F. 3rd, 248, wasn't enough to stop Mr. Adele from making misrepresentations under oath. As a matter of fact, Your Honor, if you look at the very bankruptcy plan which was proposed by Mr. Adele when he filed his voluntary bankruptcy petition in Florida in November of 2003, it would have required John Richards Holmes to repudiate Judge Rhodes's award. Why? Because that plan and the next three after it said that John Richards Holmes' right to recover anything in that bankruptcy would be dependent upon a successful recovery in a malpractice litigation against Mr. Adele's then lawyers who filed the involuntary bankruptcy petition, the Schaefer and Weiner firm. Here was the problem with that, Your Honor. The problem was, was that Judge Rhodes specifically found that Mr. Adele had withheld information from those lawyers, which is why they filed the petition in the first place. It was dead in the water. If you want to continue, you'll be using your rebuttal time. I understand, Your Honor. That's all I'm addressing on the punitive damages. Thank you. Thank you. Good morning, Eric Brunstad on behalf of Kevin Adele. I think I'd like to start at the beginning, which is Judge Rhodes' initial orders where he denied Honigman's request for attorney's fees and he denied JRH's request for sanctions Judge Rhodes held. The reason why that's relevant is because this being a bankruptcy appeal, this court will disregard the intermediate step in the district court and reviews directly what the bankruptcy court held. In the initial case, Judge Rhodes denied— Well, we give deference to the bankruptcy court, but we're reviewing the district court, formally speaking. Formally speaking, it's an appeal from the district court to this court, but under the Ong Kim case, which we cite in our brief, the court, in essence, looks at this as though it were in the same shoes. And of course, the court looks at what the bankruptcy court did. And initially— But the bankruptcy court didn't—the bankruptcy court made a couple of decisions, though, right? I mean, it made later decisions that were inconsistent with that. Well, that's because the district court reversed the initial decisions. So we are revering—we must review, in the first instance, the initial decisions of the bankruptcy court, because if those were correct and the district court was wrong, then you simply affirm that, and that's a simple way to resolve this case. But what's before us is the October 2011 decision of Rhodes. That's what issued the awards. No, Judge Stranch, the first awards were on September 21, 2006, where Judge Rhodes did the following. No, I understand that. I've got 2006. I've got 2009. Correct. But this is—the actual dollar figures that we're talking about today derive from the October 27, 2011 decision. That's correct. Correct? That is correct, Your Honor. The $1.8 million in attorney's fees and the $2.8 million in sanctions. Not punitive damages, but sanctions under the—and what Judge Rhodes did initially, though, is he said, quote, Honigman not only seeks attorney's fees and costs for the appeals—that's the appeal of the initial $6.4 million—but for all fees and costs incurred trying to collect the judgment, Honigman offered no legal support for this request in light of the case law. To the contrary, this court must deny its application for the attorney's fees. Initially denied. And then in the second instance, with respect to punitive sanctions, the court says this court declines exercising its discretion to sanction Adele, either pursuant to any inherent power it may have or pursuant to Section 105. And the court said, if you have a problem with Mr. Adele's filing for bankruptcy in Florida, go see Judge Pasquet, which of course they did, and Judge Pasquet then decided no sanctions, it's not appropriate, and that was affirmed by the Eleventh Circuit Court of Appeals. So we review Judge Rhodes' initial decisions for abusive discretion— Well, you can say that, but basically we have a decision below that went through several steps back and forth. We have a decision below that grants attorney's fees, right? It's either right or wrong. Correct, Your Honor. To the merits. Why Judge Rhodes was right the first time and wrong the second time. Section 303i, the Supreme Court tells us in Buchanan, we construe fee-shifting statutes narrowly. This court has held in McCreary there must be an explicit authorization and we have to look at it very carefully to see if it's authorized. It's not really a fee-shifting statute in the sense that one side won and therefore got the fees because they won. Under 313i, it's because it's improperly brought, right? Well, but it is a fee-shifting statute, Your Honor. And the Ninth Circuit— In a sense it is, but it's not a typical fee-shifting statute because you've got to—it's in the nature of a, I don't want to say, a deterrence and a compensation for something that should have not been brought in the first place. Very well, Judge Rogers. Just like Rule 11 and in Cooter & Gell, the Supreme Court says we don't construe Rule 11 to authorize the recovery of appellate fees. The Supreme Court has a consistent jurisprudence on this. The Ninth Circuit in the Higgins case said expressly, Section 303i is not available for an award of attorney's fees other than in defending against the petition itself. It does not authorize an award of fees on appeal. Wouldn't that be kind of anomalous? I mean, it would seem like you should be able to get the cost of the fees regardless of how you spent them. And they did. In section—in getting the $6.4 million award, they got $300,000 worth of attorney's fees, which is what the statute provides for. If this court were to say that Judge Rhoades was wrong, this court would establish a conflict among the circuits with the Ninth Circuit in Higgins and its subsequent cases because the Ninth Circuit has said, Section 303i does not authorize this kind of award. Also, I respectfully submit it would be in conflict with the Supreme Court's analysis for how we must evaluate these kinds of statutes, regardless of whether you think of it as a sanction statute or as a fee-shifting statute, whether it's Cooter and Gell or whether it's Buchanan. We construe them narrowly. And there must be some evidence of compelling congressional intent that the statute was intended to apply in this kind of a context in order for a court to conclude that there isn't. What's the literal language of the statute? The literal language of the statute, Your Honor, 11 U.S.C. Section 303i, if the court dismisses a petition under this section, other than consent of all the petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment against the petitioners and in favor of the debtor for costs or a reasonable attorney's fee, in the singular. And that's what Judge Rhoades did with part of the $6.4 million judgment. And now we had a judgment on the fees. Honigman never came and sought to reopen that judgment, yet it wants additional fees. In our jurisprudence, you cannot say, well, we have a judgment in place, but now we want to add to it. But we don't have to reopen the judgment, and it's clear why Honigman did that. But if you have the issuance of a fee, focusing on the singular language of the statute, and there are subsequent instances where the court rules, there's nothing about this language that says the court can't impose another fee, does it? Well, except that we had a judgment, and the judgment established the fee, and if you want to add to the fee award, you had to reopen the judgment. But we have a standing problem here, because the judgment was in favor of JRH, not in favor of Honigman. Honigman simply went to the bankruptcy court and said, order Mr. Adele to pay our fees. After the involuntary bankruptcy case had been dismissed, after the judgment had been entered, and as we know, once you have a judgment that's entered, a case is dismissed, subject matter is at an end with respect to what is in the judgment, which included attorney's fee. They never reopened the judgment. Plus, we have a bankruptcy jurisdictional problem, Judge Donald, because there's no rising and rising unrelated to jurisdiction for bankruptcy purposes, when in fact you have a situation where the law firm of the erstwhile debtor is suing somebody else, it's not related to the estate. But why is this not related to, since these subsequent actions were, in essence, to affect the, or to collect the judgment that was entered earlier, why isn't that? No, Judge Donald, because under Celotex, there's no impact on the estate. The estate was gone. It was simply Honigman wanted to collect its fees directly from Kevin Adele. Of course, it had no standing to do so, because Section 303I says, only the debtor can ask for that. And of course, the debtor already had a judgment. The judgment was not reopened. There's no subject matter jurisdiction, because of the fact that the claim merged with the judgment. There's no bankruptcy jurisdiction, because there's no conceivable impact on the estate. But more importantly, Section 303I does not authorize this. The Ninth Circuit has ruled that in Higgins, the Supreme Court says we construe these things narrowly. The Supreme Court said in Buchanan, one of the reasons why is because we don't want satellite litigation about attorney's fees years after the litigation is over. We are 10 years after the 2003 judgment, and that's exactly what the Supreme Court says we don't want. And the Supreme Court said in Cooter and Gell, we don't construe Rule 11 to authorize other fees. Why? Because there are other mechanisms for doing it. If they wanted their attorney's fees on appeal, with respect to the 6.4 million judgments, they should have come to this court under Rule 38 and asked for it. They didn't. Judge Rhoades said specifically in denying sanctions, he said specifically, if you have a complaint, go to the Florida court, Judge Pasquet. They did. And Judge Pasquet entered a very thoughtful opinion. He heard all of the evidence about Kevin Adele did this and Kevin Adele did that. And Judge Pasquet ruled in his decision, the post-filing litigation for which JRH now seeks sanctions was primarily initiated by JRH, who relentlessly pursued its claim and objected to the debtor, Kevin Adele's, every attempt to achieve the rehabilitation through confirmation of his Chapter 11 plans. The court is satisfied that Adele attempted to pursue a legitimate goal within the utmost of his ability and therefore to impose a sanction would be a double punishment in addition to the 2 million judgment imposed by the Michigan Bankruptcy Court. Judge Pasquet heard all of these arguments. He rejected them. That decision by Judge Pasquet in Florida was affirmed by the District Court in Florida and by the 11th Circuit Court of Appeals. Now in order for there to be an inherent sanction against Mr. Adele here in a subsequent proceeding, it's basically a collateral attack on what Judge Pasquet already ruled. Initially, Judge Rhodes said, again, if you have a problem with what Mr. Adele did, go to the Florida court, go to the court where the alleged misconduct occurred, and ask for it. They did. They went to Florida. They lost. And now they want to say, we can have a second fight at the apple here. But there's a big jurisdictional problem with that. Under 28 U.S.C. Section 1334a, the judge presiding over a bankruptcy case, as distinct from the preceding, the case has exclusive jurisdiction over the case, including the propriety of filing the case. We can't have a situation, suppose, Judge Donald, you're a bankruptcy judge presiding over a case, a judgment debtor who is insolvent comes and files the petition, and now it's contested and your honor has to decide, was the case proper or not? We can't have a situation where the state court or the other federal court who issued the judgment comes in and preempts and says, oh no, the bankruptcy is improper, dismiss the case. Why? Because under 1334a, exclusive jurisdiction is vested in the presiding bankruptcy judge to decide whether the case was properly filed or not. So that precluded, not concurrent jurisdiction with what Judge Rhodes can do as a court issuing a judgment, it's exclusive jurisdiction. So now when they come back and they say, oh, we don't have to regard what Judge Pasquet said or did, that violates the exclusive jurisdiction provision in Section 1334a. Unfortunately, JRH did not respond to that argument in its brief. We briefed it, they ignored it. But it, I think, is conclusive. But even more importantly, the Ninth Circuit in Dyer and the Fifth Circuit in Hipp have both held that the bankruptcy courts do not have inherent authority to issue criminal sanctions. Under Bagwell, this is criminal sanctions. That's what we're talking about here, the $2.8 million. Why? It's not really criminal, though. It must be, your honor, Judge Rogers. And here's why. Because as the Supreme Court said in Bagwell, when you issue a significant amount of award like this, if the contemnor, the party, doesn't have the keys to his own release, if he cannot purge the contempt by his future conduct, that is criminal. And under all the authorities, that means you had to have all the protections of a criminal proceeding. You had to have all of the protections of the process. That's contempt. But just because it's a large monetary amount, that ended up, and the person may or may not be able to satisfy that, that's not enough to push it over into the criminal sphere, is it? That's correct, Judge Donald. But here's why it is pushed over into the criminal sphere. And this is what the Supreme Court made plain in Bagwell. If it's not compensatory, and here it's not compensatory, because they already got separately a compensatory judgment of $6.4 million, and they claim they're entitled to further compensation for their attorney's fees. So what is it? Well, Judge Rhoades explained very carefully in his opinion what this is. I am going to punish Kevin Adell. Opinion is replete with language of punishment. You can have something, it's kind of anomalous, but in American jurisprudence, you can have something that's punitive and not criminal. You can have a tort case where you sue for a million dollars, and you get another million dollars in punitive damages. No one calls that criminal. Well, Judge Rhoades, you're right. Now, when you talk about contempt, then there is civil contempt and criminal contempt. I understand that. But if it's not a contempt, if it's not an award because of defiance or insult or disrespect of the court, but rather harm to the other party, then that's damages which can be punitive, but it doesn't make it criminal. Judge Rhoades, you're right. I can see why it's sort of like criminal in the sense that it's punished and it's not compensatory, but punitive damages in an ordinary tort case are that as well, aren't they? Nobody calls that. I'm just quibbling with the terminology here. Yes, Judge Rhoades. And here's the distinction between punitive damages and punitive sanctions. What they asked for here was sanctions under the inherent power, Chambers v. NASCO and Section 105, where you're asking for a lot of money to punish someone. It's punitive sanctions if, as they claim, this is because he misled the court and he did various things. I understand that. It's criminal. Well, but then you say it's criminal, and that's the semantics that I'm balking at. All of a sudden, you're calling something that no one calls criminal, criminal. What the Supreme Court does, Your Honor. In a contempt context. Yes, but this is essentially contempt. Why is it essentially contempt? I'm not seeing how it's essentially contempt. Because he's arguing, the opposing counsel is arguing that, in fact, what Mr. Adele did was he lied under oath, he engaged in perjury and things like that. Those are criminal matters. But what do you decide? Wait a minute. You said those are contempt. I'm not sure that that, you know, if you don't comply with discovery and you get sanctions, that's not necessarily contempt. If it is compensatory, yes. Or if it's a small amount, a de minimis amount, like $2,500, something like that, bankruptcy judges do have the authority. Maybe I just don't understand the words. Well, I think that the cases that are instructive are the Ninth Circuit's case in Dyer and the Fifth Circuit's case in Hibb, where they looked at factual circumstances, which are basically the same here. And they decided that those fell on the criminal, the sanction side, whether you want to call it punitive sanctions or criminal sanctions, they're definitely punitive. And we analyze punitive sanctions the same as criminal sanctions under Bagwell. But putting wholly apart from Your Honor's questions about exactly what label to put here, this court in Mackle and Brown has very carefully circumscribed a trial court's inherent powers under Chambers, and by extension here, also under Chambers of Section 105. And in Mackle and Brown, this court said, look, you can only use your inherent powers to sanction what's happening in your own court. After a case has been dismissed, you don't reach out, because that intrudes upon the function of some other court to manage its proceedings. And in this respect, you're arguing that the district court judge was correct. In this respect, the district court judge was correct. Although we're arguing initially, as an initial matter, the district judge should never have initially reversed Judge Rhoades. On the second go-around, the district judge said, oops, I made a mistake. I never should have sent it back down to Judge Rhoades for a determination of the criminal sanctions. He didn't actually use those words, though. He said punitive sanctions. He didn't exactly say that. He didn't say oops. He did not. That is my embellishment, Judge Rogers. Thank you. And a good one at once. But yet, there isn't oops, because he said oops. The bankruptcy judge should never have entertained the sanctions, because the bankruptcy judge doesn't have authority to do it. Whether you call it criminal or punitive, it clearly is punitive. Under Bagwell, we analyze it the same way. I think I understand your argument, unless my colleagues have further questions. Thank you, counsel. Thank you, Your Honors. Well, it's the anchorman. Your Honor, this award is sustainable under 11 U.S.C. 303i with respect to the issue of paternity leave. If John Richards Holmes had done nothing after the filing of the voluntary bankruptcy petition, it would have ended up with exactly $0. And that's because the first four plans of reorganization that were offered by Mr. Adel would have pegged recovery of anything by John Richards Holmes to a successful malpractice litigation against the lawyers who filed the involuntary petition at Mr. Adel's behest. Those are the exact lawyers who Judge Rhodes found, as a matter of fact, affirmed by this court, that Mr. Adel had concealed information from, which is why they filed the involuntary petition. Max Newman, who was a lawyer for the firm that filed the involuntary, testified in that original proceeding. And he said, I sat with Mr. Adel, and I said, is this an undisputed debt? Because if it's not, you're going to be in a lot of trouble. And Mr. Adel said, it's an undisputed debt of $800,000, which is what he swore to. What Mr. Adel didn't tell Mr. Newman is that he had another set of attorneys, state attorneys. He had filed a fraud lawsuit in the Oakland County Circuit Court against John Richards Holmes. And John Richards Holmes answered the complaint and filed a counterclaim, denying the material allegations of liability and disputing that it owed a penny of anything to anyone. If we had sat there and done nothing, we would have been dead in the water. It wasn't until November of 2004, in connection with these Florida bankruptcy proceedings, that Mr. Adel even ever offered to post a bond. And by that point in the process, and John Richards Holmes' trial exhibit 75 makes this clear, John Richards had already spent a million dollars in fees, because it was contesting these plans all the way. 11 USC 303I is intended to be compensatory. And the only way to make John Richards Holmes whole is to award it its fees in connection with this proceeding. Mr. Brunstad talked about the fact that Judge Pasquet denied sanctions. A couple of things. Two different standards. Under 11 USC 105, the bankruptcy courts, as interpreted by the 11th Circuit, have the in the event of a bad faith filing, with respect to the bankruptcy proceeding itself. But they don't have an obligation to do so. The 303I standard is different, and therefore, the fact that Judge Pasquet found what he found is not preclusive. As a matter of fact, the Florida District Court in the bankruptcy proceedings did find that Mr. Adel acted in bad faith. Here's what Judge Hernandez-Covington said on May 11, 2005, when she dismissed Mr. Adel's Chapter 11 petition, having reversed Judge Pasquet's refusal to dismiss it. Quote, in essence, the Florida Bankruptcy Court found that Adel's Chapter 11 petition was filed in bad faith, yet refused to dismiss the tainted Chapter 11 petition. In light of the case law, this court has no choice but to find that the Florida Bankruptcy Court abused its discretion. So the notion that there's something preclusive about what Judge Pasquet did is simply incorrect. As a matter of fact, as we indicated to the court in our briefing, on August 18, 2004, when Judge Pasquet was evaluating the issue of good faith in connection with the filing of the voluntary bankruptcy petition, one of the things that John Richards tried to bring up at the proceeding is, hey, there's this whole history. There's this prior award by Judge Rhodes. They're trying to end-run Judge Rhodes's award and make us spend a lot of money, and that's bad faith. Here's what Judge Pasquet said, and I quote, oh, no, no. Disobedience of court order is in a totally different litigation than some other court. It has absolutely nothing to do with good faith in a Chapter 11 case. So there's nothing preclusive about what Judge Pasquet did. This fee petition was brought appropriately in the name of Honigman. That is what Judge Rhodes invited back in December of 2002 at a pretrial conference. So the after- Why shouldn't the attorney's fees in the other court be awarded by the other court?  That is exactly what Chambers v. Nasco said, a ruling that was endorsed in the Marietta case. Because to require John Richards Holmes to go to every single court where he had incurred attorney fees would be to do exactly what Mr. Riddell threatened and promised, and that is to make litigation as expensive as possible. And in both Chambers and in this court's holding in the Marietta case, Your Honor said, you shouldn't have to go to 10 different places where there is a pattern and a practice here of delaying and trying to avoid the implementation and the enforcement of a court order. And that is why Judge Rhodes said correctly that the filing of the bankruptcy petition was an abuse of Judge Rhodes' processes, because it was precisely an effort to end run by coming up with a plan of reorganization that was essentially a slap in the face of that initial sanctions award. I want you to address counsel's assertion that since the bankruptcy was already dismissed, that this other litigation collateral, if it may have been, neither arose out of, under, or was related to the bankruptcy proceeding, and hence, you lose. Yes, Your Honor. That is incorrect. If you look at the structure of 11 U.S.C. 303i, when an involuntary petition is dismissed, the case isn't dismissed, just the petition is dismissed. Then the case continues for the purpose of determining whether there is an entitlement to cost and attorney fees, whether there is an entitlement to compensatory damages, whether there is an entitlement to punitive damages. So the case remained live. The lawsuit was not dismissed. There was no case closed written in the docket. That's what 303i contemplates. And the reason why it contemplates— But isn't the petition the— It was the— Isn't the petition the instrument that creates or opened the case? I know you can have core and non-core, you can have adversary proceedings, but the petition is the thing that initiates the case. The involuntary petition was dismissed in July of 2002, but the case continued. And the reason why 11 U.S.C. 303i has that structure is that Congress appreciated and understood that the very filing of an involuntary petition can work catastrophic impact on the reputation of a debtor. And therefore, as soon as the court finds out, as Your Honor knows from having been a bankruptcy judge, there's supposed to be a preliminary hearing in which the court determines whether this is even suitable for involuntary treatment. And the reason why orders dismissing involuntaries are entered, even while the case continues, is that it's an effort to try to eliminate that stigma as quickly as possible to reduce the amount of damage which is there. But the case continued, and the award— And there were enforcement efforts that were being made with respect to this, and that's exactly what Mr. Adell was trying to end run. Further questions? No? Thank you, counsel. Thank you. Appreciate your argument. The case will be submitted.